IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Elizabeth Marmesh, Special Agent of the United States Department of State, Diplomatic Security Service, being duly sworn, state:

INTRODUCTION

1. I submit this affidavit in support of a criminal complaint charging LABIB CHAMMAS with Aggravated Sexual Abuse, in violation of 18 U.S.C. § 2241(a)(1), which provides that, whoever, in the Special Maritime and Territorial Jurisdiction ("SMTJ") of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly causes another person to engage in a sexual act by using force against that other person, or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.

2. I am employed as a Special Agent of the Diplomatic Security Service, U.S. Department of State at the Diplomatic Security (DS) Office of Special Investigations (OSI). My duties include the investigation of criminal and administrative violations by employees of the Department of State or violations occurring in the Special Maritime and Territorial Jurisdiction of the United States (SMTJ). I have served in DS for five years and with OSI for two years. Previously I held assignments with DS on the Secretary of State's Protective Detail and in the DS Washington Field Office. During the course of my law enforcement career, I have investigated cases of sexual assault, domestic violence, child abuse, child sexual abuse, identity theft, and passport fraud. In addition, in preparation for my duties as a Special Agent I

completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC), Basic Special Agent Course at the Diplomatic Security Training Center, Advanced Crime Scene Investigation at FLETC, Advanced Interviewing at FLETC, and the National Children's Advocacy Center training on Child Forensic Interviewing.

3. The facts and information contained in this affidavit are based upon my training and experience, participation in similar investigations, personal knowledge, interviews of witnesses, and observations during the course of this investigation, as well as the observations of other law enforcement officials whom I know to be reliable and trustworthy. All observations not personally made by me were related to me by the individuals who made them or were conveyed to me by my review of records, documents, and other physical evidence obtained during the course of this investigation.

4. This affidavit contains information necessary to support probable cause and is not intended to include each and every fact and matter observed by me or known to the Government.

### STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE

5. My investigation has determined that between the dates of August 2010, and February 2013, Labib Chammas, a United States citizen, sexually assaulted a female member of his domestic staff, herein "Victim 1" within the confines and on the grounds of his U.S. Government-provided embassy residence in Rabat, Morocco. Chammas was married to the Deputy Chief of Mission ("DCM") of U.S. Embassy Rabat, Judith Chammas, and resided in U.S. Government housing at "Villa Monterey," located at Angle Rue Mernissa, No. 79, La Pinede, Rabat, Morocco ("DCM Residence"). "Villa Monterey" is considered to fall under U.S. SMTJ. According to U.S. Embassy Rabat officials, "Villa Monterey" was first acquired by the U.S.

Government on October 1, 1986 and was purchased on March 28, 2001. Title 18, United States Code, Section 7(9)(B), provides that, with respect to offenses committed by or against a national of the United States, the "Special Maritime and Territorial Jurisdiction of the United States" includes residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of United States diplomatic, consular, military, or other United States Government missions or entities in foreign States, or used by United States personnel assigned to those missions or entities.

6. On February 11, 2013, DS/OSI received a referral from the U.S. Department of State's Office of the Inspector General (OIG). In the referral, OIG personnel informed OSI that during a routine inspection of the U.S. Embassy in Rabat, the OIG inspection team received an anonymous letter alleging that Labib Chammas, husband of the DCM, Judith Chammas, was sexually assaulting a member of his domestic staff.

7. On February 11, 2013, DS/OSI (formerly titled the DS Special Investigations Division ("SID")) deployed Special Agents (SAs) to Rabat. DS Agents interviewed Kenneth Hillas, Deputy Team Leader of the OIG inspection team. Hillas stated that he was visiting the U.S. Embassy Rabat, Morocco in order to conduct an OIG inspection of the Embassy. Hillas stated that on Friday, February 8, 2012, the OIG staff discovered an envelope addressed to "OIG eyes only" in a pile of letters containing surveys from Embassy employees in reference to their inspection. Hillas stated that the envelope contained an anonymous typed letter containing allegations against Labib Chammas of sexual assault. Upon discovering the allegations, Hillas notified the Regional Security Office (RSO) at U.S. Embassy Rabat, and OSI. Hillas provided RSO with the original letter. Hillas stated that the anonymous letter alleged that Labib Chammas was sexually assaulting one of his domestic staff. Hillas stated that the domestic staff members

were not interviewed as part of the OIG's inspection, as they were not U.S. Government employees.

8. On February 13, 2013, DS Agents conducted a voluntary interview with one of the Chammas' household staff, Witness 1, with the assistance of an interpreter. Witness 1 was one of three household staff members working at the DCM Residence at the time. Witness 1 stated that sometimes Victim 1, who served at that time as the cook at the DCM Residence, would stay later in the DCM's Residence without the other staff present. Witness 1 stated that, on these occasions, she had been told by Labib Chammas to go home from work early and that Victim 1 was left alone in the residence with Labib Chammas. This would occur, according to Witness 1, when Labib Chammas was home and the DCM had not yet returned home from the Embassy.

9. On February 13, 2013, DS Agents conducted a voluntary interview with the victim of the assaults, with the assistance of an interpreter. Victim 1 stated to DS Agents that on numerous occasions, Labib Chammas forced her to touch his penis with her hand. Victim 1 stated that, when the assaults initially began, Labib Chammas instructed her to come upstairs in the DCM's house to the "TV room" to provide Chammas a massage. Victim 1 stated that she could not refuse this demand because Labib Chammas stated that he would fire Victim 1 or call the police on her if she did so. Victim 1 stated, during the course of her providing a massage to Chammas, Chammas grabbed Victim 1's hand and then placed her hand on his penis. Victim 1 stated that Labib Chammas had been forcing her, under threat of termination of employment, to masturbate his penis until ejaculation on an average of one to three times per week for the past two years, beginning shortly after DCM Judith Chammas and Labib Chammas arrived in Rabat. Victim 1 disclosed that Labib Chammas also threatened to fire her if she told anyone about this.

10. Victim 1 was subsequently interviewed on several occasions by federal law enforcement agents, with the assistance of an interpreter. During the course of subsequent interviews, Victim 1 elaborated on the details of the ongoing sexual abuse to which Labib Chammas subjected her to between August 2010 and February 2013.

11. Victim 1 disclosed that on multiple separate occasions between August 2010 and February 2013, Labib Chammas summoned her to his presence, grabbed her by her wrists and pulled her toward him, placing her hands on Labib Chammas' penis. Labib Chammas would instruct Victim 1 to "massage" his penis. On a number of occasions, after placing Victim 1's hands on his penis, Labib Chammas would grab Victim 1 by the back of her head or by her hair and would push her head down toward his penis, instructing her to put his penis in Victim 1's mouth. Victim 1 would refuse, and on each occasion, Victim 1 would resist by closing her mouth tightly and turning her head. On more than one of these occasions, Labib Chammas' penis made contact with Victim 1's face as he attempted to insert his penis into Victim 1's mouth.

12. Victim 1 stated that Labib Chammas often ejaculated into a towel or onto the floor where the assault occurred. Each of these assaults occurred inside of the DCM Residence or in the garden on the surrounding grounds.

13. One particular incident of assault that Victim 1 disclosed occurred in approximately December 2012. On that occasion, Labib Chammas forced her to manually masturbate his penis and attempted to force his penis into Victim 1's mouth as described above. On that occasion, Labib Chammas called Victim 1 into work on a day she was previously scheduled to be on leave, recovering from a medical procedure, so that she could assist with a purported event at the DCM Residence. Though Victim 1 was on doctor's orders not to work,

Victim 1 went to work because she was afraid otherwise she would be fired. However, when Victim 1 arrived at the residence, the only person present was Labib Chammas, who was lying naked on the couch in the "TV room." Victim 1 stated, Labib Chammas told Victim 1 he missed her, then grabbed her wrists and pulled her toward him so that she was sitting on the edge of the couch. Labib Chammas moved Victim 1's hands so that they were touching his penis, then grabbed Victim 1 by the head and forced her face toward his penis. Victim 1 stated her forehead was pressed to Labib Chammas' stomach, while he tried to force his penis into her mouth. Victim 1 said she squeezed her mouth closed as Labib Chammas jabbed at her face with his penis. Victim 1 stated, Labib Chammas ejaculated on Victim 1's hands and on the couch cushion.

14. On that occasion, which occurred in the "TV room" of the DCM Residence, Victim 1 recalled that Labib Chammas ejaculated onto the couch. Victim 1 informed the investigators who initially responded to the DCM Residence in February 2013 that some of the sexual assaults described occurred on the couch in the "TV room."

15. Victim 1 reported that she did not disclose her abuse to her fellow employees at the DCM Residence.

16. On February 13, 2013, DS Agents conducted a voluntary interview of Labib Chammas. Labib Chammas stated that he had threatened to call the police on his domestic staff or fire the domestic staff because he believed they were stealing from him. Labib Chammas stated that he had received back and leg massages from two staff members, a male employee, Witness 2, and the victim, Victim 1, because he would get pain in his hip due to a medical issue. DS Agents asked Labib Chammas if the massages ever involved sexual acts, to which Chammas stated "I don't recall," and that it might have happened. Labib Chammas stated that Victim 1

offered to give him massages because she could see when he was in pain and limping and that she told him that she knew how to give massages. Labib Chammas stated that Victim 1 would massage his legs and back in the "TV room" located on the second floor of the DCM's Residence. Labib Chammas stated that Victim 1 touched his penis during one or two of these massages and that he told her "no" but that she probably touched his penis again during later massages. Labib Chammas stated that during two or three of these massages Victim 1 would touch his penis to the point of ejaculation, but that he cannot be sure because he was normally in pain from his hip injury and not thinking clearly. Labib Chammas stated that Victim 1 merely brushed his penis with her hand while massaging his upper thigh, and that it would not be possible for her to massage him because he had a cut on his penis which is chronically infected. Labib Chammas stated that there may be items such as napkins, towels, or sheets inside his residence with his semen on it because of the massages or from him having sexual intercourse with his wife. Labib Chammas stated that intercourse with his wife was possible while masturbation by Victim 1 was not due to the "mechanics" involved.

17. Labib Chammas reviewed and signed a Consent to Search Form for his residence and granted DS Agents consent to search his residence. Labib Chammas led DS Agents upstairs to the "TV room," down the hallway to the left of the stairs, and explained that he would sit reclined in the chaise lounge in the "TV room" when receiving leg massages from Victim 1. DS Agents took a photograph of the "TV room."

18. After the February 13, 2013 interview and search of the residence, at approximately 2200 hours, Labib Chammas called DS Agents and stated that he would like to speak with DS Agents again, and scheduled another voluntary interview on February 14, 2013 at 0800 hours at the DCM's Residence.

19. On February 14, 2013, DS Agents conducted a second voluntary interview of Labib Chammas. Labib Chammas reviewed the Consent for Audio Recording of an Official Interview form and signed the form, granting his consent for an electronic audio recording of the interview. Labib Chammas stated that his female household staff member, Witness 1, only massaged his feet, not his legs, and that he offered her money after the massage but that she declined. Labib Chammas stated following the one foot massage with Witness 1, Witness 2 began to massage his legs. Labib Chammas stated that after seeing Witness 2 massage his legs a couple of times, Victim 1 approached him and said that she knew how to massage because she had done it for her sister or something to that effect.

20. Labib Chammas stated the first massage with Victim 1 occurred early on after his arrival at the DCM Residence, which was in August of 2010. Labib Chammas stated that he did not recall when the first time Victim 1 touched his penis during a massage occurred, but stated that it was possibly after a year. Labib Chammas stated that he did not ask Victim 1 to touch his penis and that she did not ask for approval to touch his penis, but that she just started to touch it on her own during the massage. Labib Chammas stated that he was unable to have his penis stroked and masturbated and unable to receive oral sex due to the cut on his penis, and that Victim 1 merely brushed the tip of his penis with her fingers.

21. Labib Chammas stated that he ejaculated during massages with Victim 1, "maybe two times, three times, I don't remember." Labib Chammas stated that he could not remember when the last occasion occurred where Victim 1 had given him a massage and he ejaculated. Labib Chammas stated that he did not believe it occurred within the past couple of weeks because he had an infection for a couple of weeks. Labib Chammas stated that he does not regularly have sexual intercourse with his wife, and that he was not able to masturbate his penis

at all. Labib Chammas stated that when he ejaculated during a massage from Victim 1, he would sometimes use a towel to catch the ejaculate or to clean up with after.

22.   Labib Chammas stated that Victim 1 touched his penis "four or five times probably, three or four times." He further said that he paid the domestic staff for working late during official events, but that he did not pay them for working later than their scheduled hours during the week; Labib Chammas stated that he let the domestic staff leave early on other occasions to make up for the late hours. Labib Chammas stated that sometimes he was in pain and was unable to take medication in order to relieve the pain because of his infections, so that sometimes he could not think clearly due to the pain. Labib Chammas stated that he realized he should not have received massages from Victim 1 or allowed her to touch his penis, but that "probably this is what made me do it [referring to his pain]."

23.   DS Agents asked Labib Chammas once again if he had ever asked or forced Victim 1 to touch his penis, to which he responded, "No, never." Labib Chammas was asked if Victim 1 had ever made contact between her mouth and Chammas' penis, to which he responded, "No... well maybe some time, you know like with her nose, or something like this, yeah." Labib Chammas was asked if he had ever tried to get Victim 1 to use her mouth on his penis, by either pushing her head or asking her. Labib Chammas stated, "No." Labib Chammas was asked how Victim 1's nose could have possibly touched his penis if not. Labib Chammas stated that sometimes Victim 1 would be on her knees while giving Chammas massages in the chaise lounge or the couch in the "TV room." Labib Chammas was asked if Victim 1 had tried to use her mouth on his penis, and Labib Chammas responded, "Probably yeah, probably her nose, her face," while giving Chammas a massage. Labib Chammas stated that it was possible for his sperm to be on something from his last massage. Labib Chammas stated that maybe the

9

massage occurred only two or three weeks ago. Labib Chammas was asked if he had a massage from Victim 1 in which he ejaculated more recently than the meeting with his staff last Saturday when he threatened to fire them for stealing. Labib Chammas stated, "I don't remember... I don't recall... really, I don't recall."

24. On February 15, 2013, Victim 1 stated that when she would be forced to masturbate Labib Chammas he would sometimes try to force her to perform oral sex and that when she would physically resist and refuse to perform oral sex, he would become nervous and would shortly thereafter yell at the staff and threaten to call the police on them and fire them. In subsequent interviews, Witness 1 confirmed that often on occasions after Victim 1 was left alone in the house with Chammas when the other staff was sent home, the defendant would be angry the following day and yell at Victim 1 and other staff members.

25. In light of the disclosures of Victim 1, on February 19, 2013, DS Agents obtained a search warrant for the DCM's Residence to obtain possible biological evidence. On February 20, 2013, a DS agent and a RSO entered the DCM's Residence in order to execute the search and seizure warrant.

26. DS Agents photographed the residence and "TV room" prior to any search. DS Agents conducted an inspection of the "TV room" with an alternative light source (ultraviolet light) and discovered possible biological evidence on two couch cushions, the front couch skirt, and locations on the carpet in front of the couch. DS Agents photographed and seized the two couch cushion covers and swabbed the other surfaces.

27. On April 16, 2013, DS Agents obtained a search and seizure warrant from the United States District Court for the District of Columbia to take "buccal" (i.e., interior cheek cell) swabs from Labib Chammas in order to obtain Labib Chammas' known DNA profile. On

April 23, 2013, DS Agents took two "buccal" swabs from Labib Chammas at the law offices of Chammas' counsel in Washington, D.C.

28. The FBI DNA Laboratory, Nuclear DNA Unit, conducted serological and DNA testing on the items seized in the execution of the search warrant. Semen was identified on the swab from front right skirt of couch from the "TV room." DNA testing confirmed that Labib Chammas was the source of the DNA obtained from the semen stain on the front right skirt of the couch. Based on a statistical probability calculation in which probability of selecting an unrelated individual at random having a matching profile to the DNA obtained was equal to or less than 1 in 6 trillion individuals. In addition, a chemical test for the possible presence of semen was positive on the left couch cushion cover; although the presence of semen was not confirmed as "insufficient quality and/or quantity of biological material may affect the ability to confirm the presence of semen."

## CONCLUSION

Based on the foregoing information, I respectfully submit that there is probable cause to believe that between August 2010 and February 2013, and specifically in December 2012, within the confines of and property surrounding his US Government provided residence in Rabat Morocco, Labib Chammas, committed Aggravated Sexual Abuse, in violation of 18 U.S.C. § 2441(a)(1).

Elizabeth Marmesh
Special Agent
U.S. Department of State
Diplomatic Security Service

Subscribed and sworn before me this_____ day of May 2016.

_____
The Honorable G. Michael Harvey
United States Magistrate Judge